ARCHIBALD WILLIAMS, Appellant, *v.* RICHMOND MERRITT, Appellee.

### APPEAL FROM HANCOCK.

| 23 | 623 |
|---|---|
| 89a | 1621 |
| 23 | 623 |
| 99a | 291 |

A special agent, employed for a particular purpose only, must act within the scope of his authority, and if he exceeds the limits assigned to him, his principal is not bound. But long acquiescence by the principal in the acts done by an agent, beyond the powers conferred, will, when the principal is informed of the facts, amount to a conclusive presumption of their ratification.

ARCHIBALD WILLIAMS filed in the Hancock Circuit Court, a declaration in ejectment, in the usual form, against Richmond Merritt, for the recovery of south-west 36, 6 north, 7 west, in said county, claiming title thereto in fee simple.

Merritt filed his plea of not guilty to said declaration, on which, issue to the country was joined.

On 11th March, 1859, at a term of said court then held, the parties waived a jury, by consent, and the cause was tried by the court before SIBLEY, Judge. The court found for defendant; a motion for a new trial was made by plaintiff and overruled, and judgment rendered against plaintiff for costs. A bill of exceptions was taken to the various rulings of the court during trial of cause, and an appeal prayed by plaintiff.

The bill of exceptions states that plaintiff on trial proved: 1st, That said land was, on 27th March, 1818, patented by the United States to Samuel Glines, for military services in the war with Great Britain, of 1812. 2nd, That said Glines, on 1st May, 1818, conveyed said land to John D. Abbott. 3rd, That on 5th May, 1838, said Abbott conveyed said land to Elisha Morrell. 4th, That on 6th Nov. 1855, Elisha Morrell conveyed said land to Chas. B. Lawrence and to Archibald Williams. 5th, That on 1st Nov. 1856, said Lawrence conveyed said land to Archibald Williams, the plaintiff. All said deeds were duly recorded. Plaintiff then rested his case.

Defendant then read in evidence (plaintiff objecting to the introduction of all said evidence): 1st, A power of attorney, recorded in Pike county, on 30th July, 1821, and duly acknowledged on February 12th, 1821, dated 14th July, 1820, from Joseph Low, Nathaniel Abbott and John D. Abbott to Abraham Beck, said power of attorney authorizing said Abraham Beck to sell and convey " all those certain lots, pieces or parcels of land named and described in the annexed list or schedule, situate, lying and being in the tract appropriated by acts of congress for military bounties, in the State of Illinois, and which were severally granted to the persons whose names are annexed to each lot or parcel of land ;" with this proviso written immediately after the attesting clause, and before the signatures, " provided, however, that the condition is understood to be such that our said attorney is to take sufficient security on real estate for all the above lands which may be sold on a credit." The annexed schedule contained sixty-four quarter sections, and amongst them the land in dispute. 2nd, A deed from said Abbotts and Low, by their said attorney, Abraham Beck, to William M. O'Harra, dated 12th September, 1820, conveying sixty-three quarter sections, and amongst them, the land in controversy ; recorded 9th May, 1821, expressed to be in

consideration of $3,534, the receipt of which is acknowledged. 3rd, A mortgage of said lands, from Wm. M. O'Harra to John P. Cabanne, dated September, 1820, acknowledged 3rd October, 1820, recorded 21st February, 1821. 4th, A decree of foreclosure of said mortgage. 5th. A commissioner's deed, under said decree, to John P. Cabanne, dated 20th February, 1823. 6th, Defendant deduced title through mesne conveyances to himself, for land in controversy.

The plaintiff then proved, by the deposition of said Joseph Low, that the said power of attorney was, in point of fact, executed on 12th February, 1821; that no schedule was ever attached to it by said Abbotts and Low; that the lands were sold on a credit, and that no security of any kind was given for the purchase money; that said Beck took promissory notes, payable to himself, for the purchase money; and that no part of the purchase money was ever paid.

The plaintiff moved the court for a new trial: 1st, Because court permitted improper evidence to be read by defendant. 2nd, The finding of the court was for defendant, when, by law, it should have been for plaintiff.

Said motion was overruled, and judgment for costs rendered against plaintiff.

The errors assigned are: The court erred in finding for defendant instead of finding for plaintiff; and in overruling the motion for a new trial.

WILLIAMS, GRIMSHAW & WILLIAMS, for Appellant.

BROWNING & BUSHNELL, for Appellee.

BREESE, J. This case, differing only in the name of the plaintiff, has been before the Supreme Court of the United States, and well considered by that enlightened tribunal, and a judgment rendered for the defendant. No additional fact is presented by the record at this time, so as to affect the merits in any way. The transactions out of which the controversy arises, are very stale, having occurred more than thirty-nine years ago; two generations nearly having passed away since their origin.

We have considered the case diligently, and have examined all the authorities counsel have cited, and read with great pleasure, attention and instruction, their very able arguments, and we will now briefly state the views we entertain of the case, and of the points really worthy of consideration.

The argument of the plaintiff in error, is principally directed to the point, that the power of attorney under which Beck, the agent, sold the lands to O'Harra, in 1820, was a conditional

power, and Beck, not having complied with the condition, his sale to O'Harra, and all subsequent sales up to the time of plaintiff's action, are null and void.

We are disposed to acknowledge the doctrine of agency to the extent claimed by the plaintiff's counsel, in so far as it may be fortified by the authorities he has cited, and to adopt, without hesitation, the general proposition, that a special agent, employed for a particular object only, must act within the scope of his authority; and that, if he exceeds the limits assigned him, his principal is not bound. So far as he is concerned, they are mere nullities, unless the principal has held him out to the public as possessing a more enlarged authority; and the party dealing with such agent, is bound to ascertain the extent of his authority, and if he does not, he must suffer the consequences.

We acknowledge, however, the force of another principle equally well established, that long acquiescence in an act done by an agent, beyond his powers, without objection at the time, and which may be inferred from the silence of the principal when informed of the facts, will amount to a conclusive presumption of the ratification of an unauthorized act; especially where such acquiescence is otherwise not to be accounted for; or such silence is either contrary to the duty of the principal, or has a tendency to mislead the agent and involve innocent parties.

This is the doctrine where no agency in fact existed. Where an agency really existed, as in this case, the presumption of the acquiescence of the principal is much stronger and more cogent. Story on Agency, §§ 255, 256.

In 1 Livermore on Agency, 44 *et sequens*, it is said: "If I make a contract in the name of a person who has not given me an authority, he will be under no obligation to ratify it, nor will he be bound to the performance of it. But if, with full knowledge of what I have done, he ratify the act, he will be considered to have contracted originally, by my agency; for the ratification is equivalent to an original authority. And it is not necessary that there should be an express act of ratification, in order to bind the principal, but his subsequent assent may be inferred from circumstances, which the law considers equivalent to an express ratification." And further, p. 394, the acts of the principal are to be construed liberally in favor of an adoption of the acts of an agent. And a small matter will be evidence of such assent. Paley on Agency, 171.

But this acquiescence or assent, by which the principal shall be bound, must be given with a full knowledge, or the means of acquiring knowledge of all the circumstances of the case. If the material facts be either suppressed or unknown, the ratification is invalid, because founded on mistake or fraud. *Owings*

v. *Giddings,* 9 Peters, 609 ; *Davidson* v. *Stanley,* 40 Eng. C. L. R. 598.

Another principle, growing out of this doctrine of acquiescence, is well established and quite familiar to the profession, and it is this : when the principal is informed of what has been done, he must dissent and give notice of it within a reasonable time ; and if he does not, his assent and ratification will be presumed. 1 Livermore on Principal and Agent, 396 ; 2 Kent's Com. 615, and cases there cited in note c.

So it was held, in *Caimes & Lord* v. *Bleecker,* 12 Johns. 300, where an agent was authorized to deliver goods to a third person on receiving sufficient security for the amount, and the agent delivered the goods, but did not take sufficient security, trover will not lie against the agent for the goods, but the proper remedy is an action on the case. But where an agent, on the 18th July, informed his principal, by letter, of what he had done, and the nature and amount of the security he had received on the delivery of the goods, and the principal did not answer the letter until the 29th October following, this was held to amount to an acquiescence in, or approbation of the agent's conduct. In this case, the doctrine in Livermore is fully recognized, that the principal must express his dissatisfaction in a reasonable time, otherwise his assent to his agent's acts will be presumed.

See also, on the same doctrine, *Vianna et al.* v. *Barclay et al.,* 3 Cowen, 281. The books are full of cases of this description, but we have not time to make a reference even, to all of them.

On the other hand, it is well settled that an agent may forfeit his right of construing the silence of his principal as an implied acquiescence, by his own neglect in furnishing the latter with requisite information in due time. A delay of intelligence, until an election to approve or disapprove would be attended with no benefit to the principal, would defeat the right to construe silence into ratification. Paley on Agency, 172 ; *Amory* v. *Hamilton,* 17 Mass. 109.

Testing this case by these principles, we think there is not the pretense of a right, in the plaintiff, to recover this land.

What are the facts ?

Nathaniel Abbott, John D. Abbott and Joseph Low, living in Concord, New Hampshire, were the owners of a large quantity of lands, which had been granted to soldiers in the war of 1812, as bounties for military services, which were located in the most delightful region of this State, lying between the Illinois and Mississippi rivers, set apart, by act of Congress, for that special purpose.

Some of these lands they held as tenants in common, and

some in severalty. The tract in controversy, was owned by Nathaniel Abbott, in severalty.

Prior to May, 1820, they had corresponded with Abraham Beck, then located at St. Louis, Missouri, as a land agent, about these lands, and had requested him to find a purchaser for them, without, however, giving him any written authority to sell them.

On the 31st May, 1820, Mr. Beck wrote to Mr. Low, who seems to have been the active party in managing this interest, as follows: " On the subject of a sale of your interests in this country, I have made every exertion, and owing to a scarcity of money, no sales can be effected; and even the few who have been buying, are quitting, for the present. I have, however, at last obtained an offer from some individuals, to unite in purchasing them. They will buy the whole lot you have, say eighty patents, at $57 each, payable in nine, eighteen and twenty-four months, with five per cent. interest, secured by bond and mortgage on the property conveyed, and will buy from you those remaining unsold, sent by you to me, for sale at the same time, at sixty days' credit; the time to commence whenever your acceptance of their proposition is received by me. They would prefer blank deeds for each lot."

On the receipt of this letter, or soon after, on the 14th of July, 1820, Low, Nathaniel and John D. Abbott joined in a power of attorney to Beck, authorizing him, for them jointly and severally, to sell and convey the lands, with a proviso that he should take a mortgage on the lands sold, to secure the payment of the purchase money.

When this power of attorney was received by Beck, the parties with whom he was negotiating, declined the contract on the terms specified, as they wanted the lands for immediate sale, and were, therefore, unwilling they should be encumbered by a mortgage.

It seems another arrangement was then entered into, which is fully stated in Beck's letter to Mr. Low, of Nov. 23, 1820.

He says, in this letter: " I understood the intention of Mr. O'Harra, who is the purchaser, to be to give a mortgage on the lands. But it appears I misunderstood him. He offered to take the lands at the price, and on the terms mentioned, and to give notes at nine, twelve and twenty-four months, secured by mortgage. I understood, and so I wrote to you, that the mortgage could be on the lands; but he meant to give a mortgage on sufficient other property. This is a difference of no consequence, and I would have concluded the arrangement, but your power of attorney was a limited one, and under which a conveyance could not be good. I, therefore, made the best arrangement I could, which was to make a conveyance of the property,

and give a personal guaranty that a proper power of attorney would be forwarded, upon which Mr. O'Harra gave his notes as agreed, and arranged the balance, and gave me a covenant to execute a mortgage upon sufficient real estate, whenever a power of attorney, duly executed, should arrive. I therefore consider the thing completed. As to Mr. O'Harra's standing and responsibility, I refer you to Mr. Enoch Long, or to Major. Long, both of whom well know him. I have drawn a power of attorney, and have shown it to Mr. O'Harra, who approves it. I inclose it to you to be executed.

" My brother, Dr. Beck, will leave this, probably, before this letter will leave St. Louis; at all events, during this week. * * * * * * * I, however, inclose this by mail. As he will have considerable business on the way, and it may be some weeks longer than the mail before he arrives, and as Mr. O'Harra is anxious to perfect his title, as he purchases to sell, or trade away, your early answer will, therefore, be acceptable. Your further commands will always receive every attention in my power, and I trust the completion of this business will give perfect satisfaction."

Mr. Beck again writes to Mr. Low, under date of Dec. 1, 1820, as follows : " St. Louis, Mo., Dec. 1, 1820. Dear Sir : By the last mail, I wrote you on the subject of your business, and suggested to you a difficulty which had occurred on the subject of the sale of your lands, viz. : that W. M. O'Harra, to whom the lands were sold, suggested that he meant to give a mortgage on sufficient real estate, but not on these lands, as these lands were purchased for sale, and he did not wish to lock them up with a mortgage. As this was a matter of no consequence, I concluded with him accordingly, gave him a conveyance of the lands, and a guaranty that a proper power of attorney should be forwarded, and I took his notes for the amount, with a covenant that a mortgage on sufficient real estate should be given as soon as the power of attorney should be received. I trust you have received that letter, and that the power of attorney has been forwarded. If, however, it has not, I will thank you to."

In this letter of November 23rd, Mr. Beck inclosed a blank power of attorney, bearing the same date as the one sent by the parties to Beck, 14th July, 1820, to be executed, which had been submitted to Mr. O'Harra, who approved it.

On the receipt of this blank power of attorney, by the parties in Concord, Mr. Low added to it, in his own handwriting, on the 12th of Feb. 1821, this proviso : " Provided, however, that the condition is understood to be such, that our said attorney is to take sufficient security on real estate for all the above lands

which may be sold on a credit." It was then executed, and returned to Mr. Beck, without any alteration of the date, that remaining as in the first power, sent from Concord, as of July 12, 1820.

But Mr. Beck, in his letter of December preceding, informed the parties, the donors of the power, that he had, on the 12th of September, 1820, sold and conveyed the lands to O'Harra, and delivered the deed, taking no other security from him than his personal covenant, that he would give real estate security, when a proper power should be forwarded by them. For the reasons stated in this letter, Beck urged the execution of the power.

Mr. Beck conceals nothing from his constituents. He informs them, in November, 1820, that the parties to whom he was about to sell objected to mortgaging the lands for the purchase money, and as he is limited by his power to require a mortgage upon them, he candidly tells them what he judged best for their interest to do. They desired to sell. O'Harra dealt in these lands, for they had, at that day, a certain market value, but would not encumber them. Being anxious to effect a sale for them, he sold and conveyed the lands, by an absolute deed, to him, taking his personal covenant that he will hereafter give the required security. He is a responsible man, and reference is made to Major and Mr. Long for his responsibility. If they were not satisfied with what Mr. Beck had done, the strangest way possible by which to manifest it, was to return him the power duly executed, ante-dated to a period expressly to cover this very sale.

If all these do not come fully up to the principles and cases we have cited, we should despair of finding a case that did.

What, it may be asked, was the object of returning the power to Beck, leaving the date of it unaltered, if it was not to validate his sale to O'Harra? Beck had put them in full possession of all the facts, and if they did not intend to validate the sale, why not withhold the power of attorney? On every principle of law and justice, they must, at this late day, be considered as having assented to the promise or covenant of O'Harra, to give a mortgage on real estate, and if he deceived them, and did not do it, it is far more just that they should suffer than innocent parties purchasing the property, without any notice of a non-compliance of conditions.

So far as the sale to O'Harra was concerned, the proviso was ineffectual, and they knew it. Major Long and others, to whom Beck referred in his letter of November preceding, may have satisfied these gentlemen that O'Harra's covenant was ample for their security.

There is no proof that he did not give this security on valuable real estate in St. Louis. Joseph Low does not prove that he did not give it. He speaks of information and belief, which is insufficient. Who has examined the records in the State of Missouri, by which the fact might be certainly ascertained ?

These parties knew, in November, 1820, their agent had made the sale, the manner, circumstances and security taken. They knew all about it, and never whispered a word of dissatisfaction or complaint, or attempted to exercise any act of ownership whatever over the property, by paying taxes or otherwise, until eighteen years thereafter, when they sold to Elisha Morrill.

The facts, then, being that the agent had fully informed his constituents of all the facts, and no dissent expressed by them by word or act for eighteen years, an acquiescence in his conduct must be implied, especially since innocent parties have acquired important and valuable rights growing out of the transaction, to which they were willing parties, and which should not be disturbed at this late day. As they chose to preserve silence when duty required them to speak, they should not be heard when justice requires them to be silent.

As to the testimony of Joseph Low, we cannot think it should have any weight to disturb this title.

The rights of the parties ought to be determined, as they were shown by the record at the time the defendant purchased and took possession. If there was nothing on the face of the record, or elsewhere, imposing upon him the duty of inquiry, to ascertain if the agent had or not dealt fairly with his principal, he ought to be permitted to repose upon the record in security.

The power of attorney authorized the agent to sell for cash. It was recorded 30th July, 1821, with directions, however, if he sold upon credit, to take real estate security.

The authority is to sell for money ; that is the scope of the power. A credit sale is permitted, not enjoined. But the deed recites the sale was for cash, and its receipt acknowledged, and therefore within the power.

Though under certain circumstances it might be shown no money was in fact received, we do not think, after this great afflux of time, it should be permitted in this case. The power of attorney has been on record near forty years, and for five years this defendant, and those under whom he claims, have been in the actual possession of the land. It has been repeatedly sold, and it is now too late to inquire if the original purchase money, or security promised forty years ago, has been paid or given. With the Supreme Court of the United States, on this point we think testimony for such purpose is not admissible. The judgment is affirmed.

*Judgment affirmed.*